One submitted, but before we do, I have a motion for admission to the bar, and since I'm making the motion, of course, I can't decide it. So Judge Toronto will preside, and assuming I prevail, I move the admission of Laura Elizabeth Powell, who is a member of the bar, as I will discuss, and is in good standing with the highest courts of Georgia and the District of Columbia. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. Ms. Powell has a law degree from Vanderbilt University in Nashville, Tennessee, and she has a, this is particularly science and public policy, where she specialized in science and technology policy and energy systems at the Georgia Institute of Technology in Atlanta, and she also spent some time at Oxford, which, of course, is not Cambridge, but it's pretty good. And she also clerked for Judge Sleet in the District of Delaware, which is as patent-heavy a place as you can be. So I move her admission to the bar of this court. I support the motion. Okay, well, then the motion is granted, and if you want to stand up and get sworn in, welcome to the bar. Thank you. Please raise your right hand. Do solemnly swear that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America. Thank you. Welcome to the bar of the United States Court of Appeals, Ms. Powell. I won my first motion. Okay. That's an industrial park. Mr. Levikoff? Good morning, Your Honor. You want to keep four minutes for your rebuttal? I would like to, please. Okay. I'm not sure I can top that presentation, but I shall do my best.  I'm here on behalf of the University of Georgia. I'm a lawyer. I'm a lawyer. I work for the Levikoff Law Firm. I appear before Your Honors on behalf of the appellant, Gadsden Industrial Park. I will refer to them as GIP, I'm sure. So if I refer to them as GIP, that's who I'm referring to. The Fifth Amendment to the Constitution of the United States states in the express letter, nor shall private property be taken for public purpose without just compensation. And in the cases that we cite in our principal brief, that amendment and the notion of just compensation is described as a fundamental component of equal justice under the law. Okay, 262-63. GIP references donations of slag for parking lots and so on. Did they claim a monetary benefit on that, that is, a tax benefit and value it? Candidly, I'm not sure. I'm not sure that appears in the evidence, and I frankly don't know the answer. I believe... That might give a valuation. Let me answer you this way. Whatever the tax requirements might have been, I'm sure my client complied with them. Can I just ask you, it seems to me there are a number of issues that have been raised here, mostly on the government side. Let me just, so you know what I'm focused on. Please. One is as to their argument about the non-metallic material, namely the slag. The question, why isn't all of your interest in that still on site and therefore not taken? 42, 420,000 cubic yards. And then on the other side, what case would stand for the proposition that a trial court in a takings case is not, is obliged to, having rejected the plaintiff's evidence of a calculation of damages, obliged to do the work himself in this case to create his own damages? Two excellent questions. Either one, I don't care the order, but those are the two that I come in focused on. Two excellent questions. I'll answer them in the order in which they were presented. I think they get to the heart of many of the matters. As to the slag, the answer is twofold. Number one, the lower court found that all of the slag was taken because it has been what he called embalmed permanently. What is the record support for that? The record support for that is also twofold. Number one, Don Casey testified that the slag has been mixed with trash and therefore is unusable. And second of all. Did you have a site for that? I do. I do. Thank you. Bear with me. Please. We will. It's your time. I have to get that. You can do that on your response. Thank you. I appreciate that. And there's testimony to that effect. We do cite it in our brief and I will find that for my rebuttal time. I will get you a site to this. So there's a site that it was mixed with trash and therefore it can no longer be obtained? Correct. What about, I believe there was a question. The court below said that it wasn't capped. But they did say that it was encapsulated. What is encapsulated? What is capped? Are they different things? Cap refers to placing a cap cover on top of it. And that was the stated intent of the EPA at the inception of the project. And in fact, that was never done. I don't recall the word encapsulated. I'm not saying it's not in the opinion. Embalmed. He does say embalmed. Yeah, that's right. And what he means by that is that it's unusable. And again, I will locate Don Casey's testimony to that effect. It is cited in our brief. We make the point that the government takes issue with that factual finding. But not only is it supported by the record, but in further answer to your question, the court visited the site and saw it with his own eyes. The court did not cite any record evidence to support that finding. And so I would just say these sites are, to me, very important. Sure. In its opinion, it did not. I will find you the record citation. And again, I will be ready with that on rebuttal. Capping is designed to prevent percolation and leaching of substances out of heat. Correct. Which was the principles, the stated concern of the EPA, and wasn't done in this case. And so without capping it, that's going on, is it not? One would think. To the extent that was ever a bona fide environmental hazard, that one would think that indeed that is still occurring. And further to your point, the leachate, the offensive leachate, comes from slag, which is the slag that the EPA's project intended all along and did leave on site. All they took away was the non-hazardous, valuable, saleable metallics, which gets to Judge Toronto's second question, which if you would remind me what your second question is. Your case in your affirmative appeal says that even though the court of federal claims rejected your calculation, it was error to stop there. He should have gone on and created his own because the materials were there to do so. Got it. And my question is, if he had gone on, I don't think anybody would dispute his discretion. Anyway, I wouldn't dispute his discretion. But you're disputing his discretion to stop there and say it's your job, you failed in your job, I'm done. It strikes at the heart of this case, your question. Here's the answer. The court didn't credit the defense presentation that this material was valueless. Quite to the contrary. As the court had to do, given the body of record evidence, the court repeatedly found that this material has value. He just couldn't figure out exactly how much. No, he said you didn't figure out exactly how much. He said we didn't prove with mathematical precision. He said with reasonable certainty. And in so doing, he made a number of errors in why he rejected Mr. Gleason, and I'm happy to discuss those errors. But the question is this, what case or cases do you have for the proposition that the district court had an obligation to figure out the amount of damages, if there is such a thing? Did he have an obligation, or is it more that if he's able to, he can? And then the other question is, I guess, well, I have other questions, specific questions, but why don't you answer that first question? Okay. First and foremost, the principles that inform the discussion of just compensation all say that it's a flexible concept, that the idea is to do substantial justice. That's quoting from the United States v. Miller Supreme Court case in 1943. The just compensation principle. I guess just to put a finer point on it, that doesn't seem to me to answer the question. Sure. Do those principles override normal litigation procedural principles, whereby if a plaintiff with the burden on the issue, which is undisputed, fails to make a case that the trial court can say, you're done, I'm not going to, even if I could, make the case for you. Because this case involves a constitutional right, the answer is yes. Are you saying, okay, what authority? Because I couldn't find any. I'm getting there. What authority says that there is a constitutional obligation on the part of a court when there's a failure of evidence obligation to move forward, not ability? I'm going to cite you two important cases. One is, in our brief, we cite the Whitney case, which relies on Almada Farmers, which is a 1973 United States Supreme Court case, which says that the concept of just compensation imposes on the court the duty of determining what compensation is just. Second of all, this court, in the Otay Mesa case that we cite, that case really is the case, in my view. But isn't that a case where both parties presented evidence on what the damages would be and the district court or the lower court, in its discretion, fashioned a different amount of damages? No doubt about it. There's nothing in here that says that the court has to. It says that it may. Well, actually, there's a very critical quote in that decision that says, where the parties presented extreme and divergent positions, which is certainly the case in this case, and the court rejected both of them, which is also the case in this case. This court says the trial court had, and I quote, few options but to fashion its own award. Now, what that is saying is that the text of the Fifth Amendment states you can't take a private citizen's property without paying just compensation. And what that's saying is if the government seizes private property, offers nothing, tenaciously litigates, the plaintiff prevails on every issue except the technical quality of some of its damages evidence, the court has few options. But if it disagrees with Mr. Gleason, who was GIP's damages expert, the court was duty-bound to go into the record and afford just compensation because a zero award under circumstances like these, where the government seizes property and sells it for $13.5 million, a zero award under that circumstance is unjust, and justice is built into the text of the Constitution. Can I ask you something specific? Am I going into my time? Oh. Go ahead. I don't want to eat up your time, but I do have questions that I want to ask you. Please, go ahead. So I want to ask you, what about the avoided costs? It seems to me, I mean, I look through all the record evidence. I look through the testimony of Mr. Gleason and the government's damages expert, and how would you calculate avoided costs in a way that's different than the way Gleason did? I mean, it seems to me that that's where the real problem is. Yeah, well, interestingly, to me, that's really the only variable. I mean, we know the amount of material that was taken and sold. We know what it's sold for. We even know the pricing, which. I agree with you, but that's why I'm focusing on this. Yeah, the variables and costs. At the outset, that is the government's burden. Once the value of the material is established, it would be the government's burden. You're saying the revenue, once you establish the revenue stream, then they had to show what you would have, the costs you would have incurred in order to get that revenue stream? Absolutely. I think that makes sense. What case do you have to support that? Well, there isn't a case that stands for that precise proposition. That's not surprising. Well, but, you know, once you establish that the government seized private property and sold it for millions and millions of dollars, that makes a prima facie showing. If the government has evidence that would mitigate damages and show that that compensation would be unjust, that's the government's burden. But your damages would not be the revenue. But notwithstanding that, the court, in its opinion, says, well, I think the costs are more like $7 million plus freight, and freight would have been about $1.5 million. So if you take the $13.5 million in revenues, subtract what the court thought was $7 million in costs instead of the $4.9 million that Gleason said, you add freight, you end up with an award of $5 million. That is the precise inquiry that the court should have made. Or the court's empowered to take more evidence, to order more evidence, or even to appoint its own expert. But the court can't throw up its hands. It can't just throw up its hands and say there's a constitutional duty that when the government seizes property and I just can't figure it out and therefore you get nothing. This isn't the case where GIP came in and thrust itself on the court and said you figure it out. It made a comprehensive damages analysis. The court just had qualms with this component and that component. If you want to reserve your time, please. I'll give you a couple of minutes here. Thank you. Let's hear from the United States. May it please the court. And I'd like to start off with where... Well, let's start off with some questions. Okay. Yes, sir. On page 4 of the red brief, the government refers to the north and south piles as, quote, enormous undifferentiated garbage dumps. Yes, Your Honor. Does the government, other than leftover food from the Army, does the government often sell garbage for profit? So if you're talking about when it was sold in bankruptcy... No, I'm talking about when you sold the contents for mining purposes. The piles were undifferentiated garbage. That's undisputed. There was actually... I mean, these were their waste piles. They actually found a railroad car buried in these piles. Nobody knew what was in it. What we did with Harsco was we had a contractor out there and they let Harsco dig. And Harsco paid the contractor who was doing the environmental remediation part of what they were earning from the dig. But ultimately, there were no profits. This was done at a loss. So the whole point here was not to make profits for the government but to try to remediate this pile as cheaply as possible. So no, Your Honor... Do I remember right that this was about a four-and-a-half-year Harsco project? Yes, it was. Between 2009 to 2013. That's correct. And it turned unprofitable in roughly the last year. The first year-and-a-half was profitable. The testimony I believe, Your Honor, the first year-and-a-half was profitable. Then it became less profitable, unprofitable. And the testimony from our expert was that if you put it all together, it was a losing proposition for Harsco. Right. But why wouldn't one ask the question from G.I.P.'s perspective? Maybe it would have turned unprofitable, but if G.I.P. were running it, it would have stopped its own mining before it turned unprofitable. So there might have been, what did you say, a year-and-a-half or two years' worth of profitable digging, and at least it could have gotten that because as soon as it saw it was unprofitable to continue, it would have just stopped. Well, respectfully, Your Honor, two things. One, the plaintiffs claimed the revenue from everything that was pulled out of it. So they did not make that. The argument that you're making, they didn't make that. They wanted every last piece of metal done for the four years. That means that they had to eat the costs for the four years. The second thing, Your Honor, is because they said that the taking was happened on June 4, 2008, that was their claim, they had to value the property before the property was cracked open. The takings law says, and this is under the Miller case and the Kirby case, that you value the property on the date of the taking as it is. And as it was on that date, nobody knew what was in there. So the proper method of valuation was to say, okay, you know, if a willing buyer, third party, come up, what would you pay for the right? Nobody knows what's in there. To dig in these piles. We do know it's a Superfund site. But to dig in these piles and to pull out what you're going to pull out, you take all the risk, you get to keep it, what would you pay for that right on this date? And the trial court said that is the way to do it. And he said that the plaintiffs didn't try to do it that way. The quote was, plaintiffs expert, quote, did not attempt to reconstruct what a willing buyer would have paid for materials in the piles using what was known in Oroville at the time. That was the fundamental error of their methodology. And the reason was, they were swinging for the fences. They wanted $10 million. And so they wanted – But this swinging for the fences, I forget, you used a similar phrase two minutes ago. Isn't that what the quote from Otay Mesa addresses? Namely, it's, you know, one could say that on your side, you too were swinging for the fences or in Otay Mesa, one extreme on one side, another extreme on the other. Isn't there, as long as the material, the evidence, is in the record and not too far-fetched that if the trial court could make a reasonable estimate, why shouldn't the trial court have to do that? Your Honor, we don't believe the trial court should have to, but we don't believe the trial court could. The trial court rejected every aspect, methodology, the revenue, the cost, the expert himself. The trial court rejected every aspect of the plaintiff's methodology, efforts to prove compensation. And there is simply no way, absent another trial and letting them bring in a new theory and new experts and basically have a redid. What about the court's reference to Harsko's revenue, I guess, for like, what, $13.7 million? And then also estimating, although loosely, the avoided costs at $7 million. Why couldn't that satisfy the court of claims have relied on those amounts in order to calculate the amount of damages? Respectfully, Your Honor, that was everything that Harsko dug out of the pit, out of these piles. Nobody knew on the date of the alleged taking how much they were going to get. So to give the plaintiffs the benefit of knowledge that nobody had would be like if the government took your lottery ticket before the lottery, and that's a dollar. We took something worth a dollar. But the court of federal claims did mention that 13.7 number. He did. It's a better number than the one that Mr. Cleveson provided, right? He mentioned that number, but that number was an ex post number, a number that was derived four and a half years after the alleged taking. So respectfully, Your Honor, we don't believe that could be any part of any valuation based on Why wouldn't that fall under, in Patton's world, going back to the 1930 Supreme Court decision in Sinclair, be called information you get from the book of wisdom that is written after the date in question that tells you something about what somebody might do on the date in question? Do you know what I'm referring to? I do understand what you're referring to, Your Honor. In taking's law, what that would be doing is you'd be giving somebody who owns property value that did not exist at the time that they owned the property. No, you would just be using that as evidence of what somebody might have paid for the mining right that Harsco, in fact, bought itself. But nobody driving up on the day of the taking would know that information. So the Supreme Court in Miller, for example, said under this standard, the owner is entitled to receive, quote, what a willing buyer would pay in cash to a willing seller at the time of the taking. It has to be what a third party would drive up on that day. The amount of stuff in these trash piles, the environmental risk that existed with these trash piles meant that at that time you can't go ahead and peek. Unlike the book of wisdom, you're not allowed to do that in taking's law. In the Kirby case, the Supreme Court was very clear that you have to use the knowledge only at the time. We don't peek ahead based on valuation principles. And if I can go to what Your Honor asked earlier. I have some questions I want to ask. Oh, please, Your Honor. On page 8 of the red brief, the government asserts that Gadsden, quote, represented that it had already used its allotment of slag and indicated that it was whenever the EPA needed to go to work on the solid waste piles. Yes, Your Honor. And then it proceeds to provide six separate sites which purportedly support this assertion. Let me take you to JA 2400, please. Yes, Your Honor. That's some handwritten notes. Yes, Your Honor. Those were notes made at a meeting with Mr. Casey. And there was testimony about the contents of these notes where the author expressly said, well, the notes actually, I think, speak for themselves. Yes, I think so. If you'll turn to that page. Yep, that's the plaintiff. Still saying they don't own this slag until they take it. Do you see where I'm pointing, Your Honor, or do you see what I'm referring to?  Yes, Your Honor. If you see in heavy lettering, oh, one, two, three, four, five, six, or so, GIP in heavy lettering on the left. Six lines from the bottom. Yeah, six lines from the bottom. Yes. Okay. And the line above that. The word kish there? I just want to make sure. Is that where the court's referring to? Yes, it begins with kish. Yes, Your Honor. The sentence at the end of that line that says, in plain English, they own piles? Yes. If that was their position. So let me just take you back to this point because that's very important. At this point, the EPA wants to know who owns the piles because it wants to establish environmental liability. If the plaintiffs had said, we own the piles, EPA would have been thrilled because at that point, EPA doesn't have to pay for the cleanup. The plaintiffs do. In fact, the trial court expressly said that the plaintiffs were vague. Every time they talked about this, they didn't want to take liability for the piles. So, Your Honor, I see that it says that. But if the plaintiffs had said, we own the piles and everything that's in them. You see that it says that. It does. And if that had been the position of GIP at the time as opposed to now, then the EPA, the next thing it would have been writing, then you are financially responsible for all of the environmental problems in this pile. You cited me to that page. I did. And the next sentence says, and this person is taking notes, and I don't remember if there was testimony about that line or not. But the next line says, they don't own the slag until they take it. That's what it did. And so we do believe, and the trial court cited some of these documents and said, more or less, if you read between the lines, more or less said, they were intentionally vague because they wanted to avoid liability. And, Your Honor, I would say that, you know, my counsel at the bar said, my colleague at the bar said, you know, that justice requires this. If the plaintiffs hadn't played games with the EPA and basically denied ownership of these materials that they now claim ownership of, the EPA never would have gone out there. They would have told the plaintiffs to go out there that they had to do the cleanup. So to come in here, I won't say unclean hands, but to come in here and basically after twisting things with the EPA and undermining so that the EPA felt they had to go out there and do the cleanup, to now say, oh, we want, we're being denied justice, that's not fair. If they had just said, we own everything in that pile, we're responsible for that pile, then we wouldn't be here because they would have been out on the pile. Even today their position is not that they own everything in the pile. Rather, they own all the metal, let's call it, and 420,000 cubic yards of slag. Yes, Your Honor. I don't know. But under environmental regulations, if they own, the slag was the thing that was actually causing the leachate. So under, and anybody who digs in those piles becomes responsible for them, which is why they said. Even a non-owner. Even a non-owner, unless, unlike the government's contractors, they had waivers from the EPA, but no private owner, no private person who went out there to try to make money would have those waivers. That's why, I mean, those piles are sitting there. The testimony, Your Honor. Are they capped? No, they're not capped. And the testimony was very clear that they're never, in fact, the trial court found that they were never capped. I understand. So the point is, why not? Because what they did instead was they curved them like this so that the rainwater would pour off them. And the truth is also that they ran out of money. And so they curved them. They believed that that was as good as they could do, and they left. And that's the embalming? There's no testimony about embalming. And the trial court never made factual findings in any way about anything being bombed. In fact, the testimony was that anybody could go out there and dig right down. What are your cites for that? Okay. So the, nothing stopped them from digging A1064, 1065. They were only contoured. And what about your, Mr. Levikoff, I think, said that there was testimony from Mr. Casey. That's mixed with trash. Yes, Your Honor. Mixed with trash. And I think the implication was we couldn't effectively separate the slag from the trash. And I just, I mean. Or garbage, in your words. My rebuttal time, can I have the time to answer, Your Honor? Go ahead. Okay. Free country. These were waste piles. These were, and the citations, I mean, these were licensed waste piles. They were, everything was mixed with trash before anybody went out there. So to say that the slag was mixed with trash now, it's factually correct, but only because they've always been, everything. They found bins. They found, I mean, they found, like I said, a railroad car. They found all kinds of trash out there. There were weeds growing on top of it when it first started. So to say that there was trash. So, Your Honor, so the point is that even from the beginning they must have known that there was going to be a lot of sifting to be done. Yes, Your Honor. Okay. And that how they exist now is no different than how they were when Harsko found them in the beginning. And with that, I'll stop. You'll get a couple of minutes. Thank you, Your Honor. Judge Stoll, to answer your earlier question, the appendix site is appendix 265 and 266. Don Casey said it's all mixed in trash. They didn't size it. They just threw it in a pile. You can't sell it as slag. And then he goes on to repeat that. You can't sell it as slag. But if sifting is possible, why doesn't, which particularly if everybody knew from the very start that sifting was going to be needed, why does that negate the idea that it's still there for the taking in a non-constitutional sense? The contours of it has been changed since before the EPA did its project. So Mr. opposing counsel's representation that it's the same as it ever was is interesting, but it's not faithful to the record, and it's not what the court below found as fact. Now, this court needs to defer to that court's factual findings supported by the record. But it used to be more Mesa-like with a flat top? It wasn't mixed with trash. It wasn't mixed with chemicals and trash. Does the citation that you provided to 6566 say that it didn't used to be mixed with trash? Well, Don Casey's testimony is when he purchased it, it was reclaimable. And the testimony I cited to says now it's not, and the court so found. The notion that opposing counsel said that had G.I.P. just expressed an interest, an ownership interest in these materials, the EPA just would have backed off and let G.I.P. have it, is... I'm sorry, that's not what he said. He said that had you expressed an interest, then it would have, as a shorthand, succeeded in its CERCLA claims against you to make you clean it up. Well, I was going to say what in fact the government did was threaten to G.I.P. when G.I.P. asserted rights in those piles and did file a CERCLA action, and did file the CERCLA action based on G.I.P.'s asserted ownership of the piles. And you said that that action was resolved in your favor? It was dismissed at the motion to dismiss stage. On what ground? That you weren't the owner? No, on the grounds that by owning slag, it's not a site under the CERCLA statute. But the point is that the government... You need to wrap up. The government didn't intend to back off if G.I.P. asserted ownership. G.I.P. asserted a right, whether it called it ownership or a right to mine or whatever, whatever Don Casey in his lay speak called it, he clearly asserted a right to go into those piles and get the value that he had purchased. And the notion that the government, if they had known that was his take, they would have approached this thing differently is... I hate to use the word, but it's facetious. I mean, they continued to contest. They continued to hotly contest ownership, whether there was a taking, whether there was value. Thank you. Thank you, counsel. You have two minutes. Thank you, Your Honor. So this is our cross appeal where we asked the court to reverse the award that was already made. What was the ground for the dismissal of your CERCLA action? You know, Your Honor, in all honesty, I don't recall. I should have that in front of me, but I don't remember. If it was that to be an owner you need to own the land, then what you said before about the criticality of whether they owned the pile might not be terribly material. Well, if they claim to own the pile, and especially if they dug in the pile, okay, so to get the stuff out they had to go on the pile and dig it. If they were going to remove anything from the pile, my understanding of the EPA, and the EPA told them this, which is why they kept saying that they didn't own. I mean, just to trace the record, okay, Mr. Casey said, my understanding. Where are you? A2832 in an e-mail. My understanding is GIP does not own the two remaining slag piles but does have the right to mine them. Mr. Casey in an e-mail, February 0808, who bought the right to mine 400,000 cubic feet, which we may have already used. So he's saying that they may have already used it up, which gets to a second point that the Court has asked about, whether they had any left. They did not keep any records. So as far as, I mean, whether they were entitled to any more slag than what they'd already kept, they couldn't make the basic proof of how much they'd already taken off. And, of course, the burden of proof was on them to show that they hadn't taken 420,000 cubic yards already. Can I ask you one very specific question? Sure. Having to do with the idea that the 420,000 that I would assume they own is still there for the taking. It is. On page 8, appendix 8 of the Court of Federal Claims opinion, there's a sentence at the end of the first full paragraph. It says, in total, Mr. Casey estimated that G.I.P. used or sold approximately 15,000 cubic yards of slag, which he estimated was 10 percent of the slag on the Eastern Excluded Property. So he estimated that there would be only 150 of slag? He estimated – I know what you're talking about, John. Let me just pull it up. Appendix 8, 6 of the original. Yes. The last sentence of the immediate paragraph. In total, Mr. Casey estimated that G.I.P. used or sold that one, which he estimated 10 percent of the slag on it. He may have estimated that, but nobody – I don't actually recall that testimony, but the testimony of a number of people was that there were thousands and thousands of cubic yards. I mean, this is – You said 3 to 4 million. Well, it's – when it started, it was 70 to 80 feet high and 10 acres wide, and there's two piles of it, and a lot of that was slag, the stuff that it was filtering through. So the cite that I gave earlier was to Mr. Brady. Wrap up. Okay. I'm sorry, I want to make sure that I answer you. When he was asked, question, do you have an opinion about whether there's significant slag left out in the pile? Answer, sure of it. So that's unrefuted testimony, that there is slag out there to be taken. And, of course, slag is fungible. So thank you, John. Thank you. The matter will stand submitted. Thank you.